USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/27/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LUXURY ASSET CAPITAL, LLC,

Plaintiff,

-against-

MADDOX GALLERY LTD. and MADDOX FA LTD.,

Defendants.

25 Civ. 7061 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Luxury Asset Capital, LLC ("LAC"), brings this breach of contract action against Defendants, Maddox Gallery Ltd. and Maddox FA Ltd. (collectively, "Maddox"). *See generally* Compl. ¶¶ 1, 54–60, ECF No. 1. Defendants move to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See* Mot., ECF No. 25; Mem., ECF No. 26; Opp., ECF No. 30; Reply, ECF No. 32. For the reasons stated below, Defendants' motion is DENIED.

**BACKGROUND**[1]

LAC provides loans secured by luxury assets, including artwork. Compl. ¶ 2. "In July 2022, LAC made several loans to an art dealer named Seth Carmichael." *Id.* ¶ 3. The loans were secured by "collateral . . . comprising various blue-chip artworks by leading artists such as George Condo, Rashid Johnson, and Robert Nava" (collectively, the "Carmichael Collateral"). *Id*. Later that year, Maddox, a self-described "leading Contemporary Art gallery and art investment advisory," contacted LAC, claiming that before LAC made its loans to Carmichael, Maddox had purchased "but admittedly never took possession of" some of the works in the

[1] The following facts are taken from LAC's complaint. The Court takes all well-pleaded facts alleged in the complaint as true, drawing all reasonable inferences in favor of LAC. *See Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).

Carmichael Collateral pool. *Id.* ¶¶ 4, 20. "Seeking to settle the dispute over the Carmichael Collateral without litigation, Maddox offered to provide LAC with a pool of substitute collateral—highlighted by three works by artist Duncan McCormick and three works by artist Albert Willem—which Maddox estimated to be worth over $1 million—in exchange for the valuable George Condo painting in LAC's possession." *Id.* ¶ 6; *see id.* ¶¶ 22–23.

On September 27, 2023, Maddox's CEO and Director, John Russo, told LAC via e-mail that Maddox's valuations of the substitute collateral were "quite conservative" and that "any sales will most likely generate a stronger result than what we have concluded." *Id.* ¶¶ 27–28. On October 17, 2023, Maddox provided LAC with a slide deck, offering "good faith estimates" of the value ascribed to the substitute works. *Id.* ¶ 29. To justify the estimates, the deck analyzed recent auction records of "comparable" works by Willem and McCormick. *Id.* ¶ 7. In the deck, Maddox represented that there was "outstanding demand" for Willem and McCormick's pieces. *Id.* ¶¶ 30, 32. Maddox stated that Willem's "meteoric rise seems to have come out of nowhere," *id.* ¶ 30, and emphasized that McCormick's artwork has "fetched record-breaking prices at auction," *id.* ¶ 33.

In December 2023, LAC and Maddox entered into an agreement (the "Agreement") to trade the Carmichael Collateral for the substitute collateral. *See id.* ¶ 55; Agreement, ECF No. 27-1.[2] The Agreement includes an exhibit estimating the "[s]econdary [m]arket [v]alue" for each item included in the substitute collateral and provides that Maddox "represents" that those estimates "are good faith estimates only, and do not constitute a guarant[ee] concerning the value of [the substitute collateral]." Agreement § 9.11. The Agreement clarifies that apart from the

[2] Although the Agreement is not attached to Plaintiff's complaint, the Court considers the Agreement because it is "incorporated in [the complaint] by reference" and because the complaint "relies heavily upon its terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted); *see* Compl. ¶¶ 54–60.

warranties listed in the Agreement, Maddox "makes no other representations or warranties regarding the [s]ubstitute [c]ollateral." *Id.* § 9.12. The Agreement states that it "represents the entire understanding between the [p]arties and supersedes any prior discussions or understandings with respect thereto," *id.* § 17, and further provides that "[e]xcept as expressly stated in this Agreement," neither party shall "rely[] on any statement, representation, or promise, written or oral, of the other [p]arty in executing this Agreement, or in carrying out the obligations provided for herein," *id.* § 9.1. The Agreement does not attach, reference, or otherwise incorporate, Maddox's slide deck or the emails transmitted from Russo to LAC. *See generally id.*

LAC alleges that "for at least one year prior, Maddox had been involved in a long-running 'pump and dump' scheme targeting works by these two emerging artists to artificially inflate their bidding and sales prices at auctions, and then use those inflated figures to justify sales and trades of works by these artists from its inventory." *Id.* ¶ 8; *see also id.* ¶ 36. In the year prior to the Agreement, Maddox had "works by these two artists in its inventory, and had been involved in selling McCormick and Willem works on both the primary and secondary markets." *Id.* ¶ 24; *see id.* (explaining that "primary market" "generally refers to the initial sale of an artwork directly from the artist or a gallery representing the artist" and "secondary market" "generally refers to any subsequent sale, including at auction"). During this time, works by McCormick and Willem "consistently sold at auction for prices *ten to fifteen times* greater than the pre-sale estimates that the auction houses had provided for these works." *Id.* ¶ 9 (emphasis in original); *see also id.* ¶¶ 36–38. LAC alleges that the auction success was the product of Maddox's purported "bid-rigging" scheme. *Id.* ¶ 40.

Auction records show that the markets for McCormick and Willem pieces "declined precipitously almost immediately following the Agreement, then bottomed-out altogether by the end of 2024." *Id.* ¶ 43; *see also id.* ¶¶ 44–48. Specifically, in 2023, fifteen McCormick works sold for an average price of nearly $160,000 per work; in 2024, however, only two McCormick works sold at auction, for an average of slightly under $40,000. *See id.* ¶¶ 37, 44. Likewise, in 2023, twenty-five Willem works sold for an average price of over $110,000 per work; by contrast, in 2024, only two Willem works sold at auction, for an average of slightly over $20,000. *See id.* ¶¶ 38, 45. When LAC contacted Russo and Maddox for explanations, LAC received no response. *Id.* ¶¶ 47–48. "Upon discovering this scheme," at least one major auction house "refused altogether to . . . offer works by these two artists in its auctions." *Id.* ¶ 10.

**DISCUSSION**

I. <u>Legal Standard</u>

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). On a motion to dismiss, the Court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Legal

conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 570.

For fraud claims to survive a motion to dismiss, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To comply with Rule 9(b), the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks and citation omitted). Although "scienter may be averred generally, plaintiffs are still required to plead the factual basis which gives rise to a strong inference of fraudulent intent." *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 101 (S.D.N.Y. 1997).

II. Analysis

LAC alleges that Maddox breached the Agreement by contractually representing that its specific estimates of the substitute collateral's secondary market value were "good faith estimates" when they were not. *See* Compl. ¶¶ 54–60; Agreement § 9.11. Maddox argues that the Agreement precludes LAC's claims because the Agreement is a fully-integrated written document, *see* Agreement § 17, and because Maddox expressly made "no other representations or warranties" regarding the substitute collateral other than those set forth in the Agreement, *id.* § 9.12; *see also id.* § 9.1 ("Except as expressly stated in this Agreement, such representing Party is not relying on any statement, representation, or promise, written or oral, of the other Party in executing this Agreement, or in carrying out the obligations provided for herein."). *See* Mem. at 9. Maddox also argues that LAC has not plausibly alleged breach of contract. *See id.* at 7–9.

The Court concludes that LAC can sue Maddox for falsely representing in § 9.11 of the Agreement that its estimates were made in "good faith." Although § 9.1, in general, disclaims

each party's reliance on representations made by the other, it creates an exception for representations "expressly stated in this Agreement." Agreement § 9.1. One of those express representations is that the secondary market value estimates attached to the Agreement and explicitly referenced in § 9.1 were made in "good faith." *Id.* § 9.11; *see id.* Ex. 3. Maddox's reliance on the parol evidence rule is misplaced because LAC does not rely on extratextual statements to alter, vary, or supplement the terms of the Agreement; rather, LAC uses these statements to show that Maddox's contractual representation of "good faith" was false and known to be false at the time it signed the contract. *See Bird v. Computer Tech., Inc.*, 364 F. Supp. 1336, 1343 (S.D.N.Y. 1973) ("[T]he parol evidence rule is not violated when the oral evidence does not alter or vary the writing or insert an additional term.").

Next, the Court finds that LAC has plausibly alleged that Maddox breached its representation of "good faith" estimates in § 9.11 of the Agreement. First, the complaint identifies the alleged misrepresentation and who made it and states where and when the statement was made. *See Lerner*, 459 F.3d at 290. Specifically, in the December 21, 2023, Agreement, signed by Maddox's CEO, Maddox stated that its estimates of the secondary market value for the substitute collateral were made in "good faith." Agreement § 9.11.

Second, LAC has adequately alleged why Maddox breached the contract—in other words, why Maddox's estimates were not made in good faith. On a motion to dismiss, the Court may not resolve factual issues; rather, it must make an "assessment of whether the [c]omplaint has alleged facts that 'nudge' an assertion that a party has acted in bad faith 'across the line from conceivable to plausible.'" *Gas Nat., Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 383 (S.D.N.Y. 2014) (quoting *Iqbal*, 556 U.S. at 680); *see also Iqbal*, 556 U.S. at 678 (explaining that although plausibility requires "more than a sheer possibility," it "is not akin to a probability requirement").

LAC's complaint plausibly sets forth that McCormick and Willem's auction prices were artificially inflated. For example, in the year prior to the Agreement, McCormick and Willem's works sold at auction prices "typically more than 10 to 20 times the pre-sale auction estimates," Compl. ¶ 36 (emphasis omitted), but after the Agreement, McCormick and Willem pieces "declined precipitously" in value and without explanation, *id.* ¶ 43. LAC claims that the auction prices were inflated by "a network of bad actors who intentionally bid up the auction prices of works [by these two artists]." *Id.* ¶ 36. Further, the magnitude of the decline—a roughly 80 percent loss from 2023 to 2024—is significant and raises the reasonable inference of a "pump and dump" scheme. *See id.* ¶¶ 37–39, 44–45. Tellingly, "at least one major auction house has refused . . . to even offer works by these two artists in its auctions." *Id.* ¶ 10.

LAC has also plausibly alleged that Maddox was involved in or at least had knowledge of the inflated values of these works. After all, Maddox "had work by these two artists in its inventory, and had been involved in selling McCormick and Willem works on both the primary and secondary markets." *Id.* ¶ 24. Moreover, according to the complaint, the timing of the market collapse coincides with Maddox's transaction with LAC: The decline in market value for McCormick and Willem pieces occurred "almost immediately" following the Agreement, and the market "bottomed-out altogether by the end of 2024" and never reemerged once pieces were "dumped" by Maddox. Compl. ¶¶ 43, 47. After the collapse in value, Maddox and its CEO ceased all communications with LAC, despite LAC's repeated outreach. *Id.* ¶ 48. Accepting these allegations as true, there are circumstantial indicia of Maddox's involvement in the scheme.

The Court, therefore, finds LAC's allegations sufficient to survive a motion to dismiss. *See also BAE Sys. Info. & Elec. Sys. Integration Inc. v. L3Harris Cincinnati Elecs. Corp.*, 716 F.

Supp. 3d 206, 220 (S.D.N.Y. 2024) ("Because the question of whether a party acted in good faith is fact intensive, it typically is not suitable for resolution on a motion to dismiss." (internal quotation marks and citation omitted)); *Loyal Bank Ltd. v. Mastercard Int'l Inc.*, No. 20 Civ. 2208, 2021 WL 3604891, at *4 (S.D.N.Y. Aug. 13, 2021) ("On a Rule 12(b)(6), the question 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" (citation omitted)).

**CONCLUSION**

For the foregoing reasons, Maddox's motion to dismiss is DENIED. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 25.

SO ORDERED.

Dated: July 27, 2026
New York, New York

ANALISA TORRES
United States District Judge